STATCO WIRELESS, LLC v.
SOUTHWESTERN BELL WIRELESS, LLC

CA 02-391 95 S.W.3d 13

Court of Appeals of Arkansas
Divisions I and II
Opinion delivered January 15, 2003

---

*Friday, Eldredge & Clark*, by: *Harry A. Light* and *Ellen M. Owens*, for appellant.

*Kaplan, Brewer, Maxey & Haralson, P.A.*, by: *Philip E. Kaplan* and *Joann C. Maxey*, for appellee.

JOHN B. ROBBINS, Judge. In this appeal, we are asked to review an order of the Pulaski County Circuit Court enjoining appellant from violating the terms of a covenant not to compete and from misappropriating trade secrets. We affirm, with slight modification, that part of the order pertaining to the covenant not to compete, and we reverse that part of the order pertaining to trade secrets.

Appellee Southwestern Bell Wireless (SWBW) is in the business of selling cellular phone service, sometimes referred to as cellular radio service (CRS) or commercial mobile radio service (CMRS). Its service is marketed through three primary channels: company stores, national retailers (such as Best Buy), and exclusive authorized agents. In 1997 and 1998, appellant Statco became an authorized SWBW agent for the Little Rock and Hot Springs areas, selling and promoting SWBW services exclusively in return

for commissions paid by SWBW. The agency agreements executed by the parties contained a covenant not to compete in which Statco essentially promised that, for one year following termination of the agreements, it would not induce customers to choose the services of a SWBW competitor, nor otherwise sell or promote services offered by SWBW's competitors.

Between 1997 and 2000, Statco became one of SWBW's most successful agents, enrolling thousands of subscribers. However, disagreements arose between the two companies over compensation, and Statco notified SWBW that, beginning March 1, 2001, its stores would become "multi-line" stores, offering the services of SWBW competitors. SWBW immediately sought an injunction to enjoin Statco from misappropriating trade secrets and from violating the contractual covenant not to compete. A trial was held, and after an extensive hearing involving thirteen witnesses and seventy-one exhibits, the circuit judge agreed that Statco's decision to market the services of competing carriers violated the covenant not to compete and violated the Arkansas Theft of Trade Secrets Act. The judge entered a twenty–eight–page letter-ruling containing her findings and entered the following order:

> Statco is permanently enjoined from violating the terms of the noncompete provisions in its agency agreements, including:
>
> (1) Entering into any relationship with a SWBW competitor to market, sell, or distribute CMRS for a period of one year from March 1, 2001;
>
> (2) Marketing, selling, or distributing CMRS for a SWBW competitor for a period of one year from March 1, 2001;
>
> (3) In any manner attempting to contact a SWBW CMRS customer with the intent or purpose of inducing or encouraging that customer to change service from SWBW to a SWBW competitor;
>
> (4) Any further misappropriation of SWBW's trade secrets.

Statco filed a timely notice of appeal from that order, and its first argument on appeal is that the trial judge erred in ruling that the covenant not to compete had been violated.

██ ██ Covenants not to compete are not favored by the law. *Federated Mut. Ins. Co. v. Bennett,* 36 Ark. App. 99, 818 S.W.2d 596 (1991). Nevertheless, they have been enforced in some instances. *See Dawson v. Temps Plus, Inc.,* 337 Ark. 247, 987 S.W.2d 722 (1999); *Borden, Inc. v. Huey,* 261 Ark. 313, 547 S.W.2d 760 (1977); *Girard v. Rebsamen Ins. Co.,* 14 Ark. App. 154, 685 S.W.2d 526 (1985). The burden is on the party challenging the covenant to show that it is unreasonable. *Moore v. Midwest Distrib., Inc.,* 76 Ark. App. 397, 65 S.W.3d 490 (2002). Covenants not to compete are reviewed on a case-by-case basis. *Id.* We will not reverse a trial court's findings regarding a covenant not to compete unless the findings are clearly erroneous. *Bendinger v. Marshalltown Trowell Co.,* 338 Ark. 410, 994 S.W.2d 468 (1999); *Jaraki v. Cardiology Assocs.,* 75 Ark. App. 198, 55 S.W.3d 799 (2001). A finding is clearly erroneous when, although there is evidence to support it, we are left, upon viewing the entire evidence, with the definite and firm conviction that a mistake has been made. *See Jaraki v. Cardiology Assocs., supra.*

██ For a covenant not to compete to be enforced, three requirements must be met: (1) the covenantee must have a valid interest to protect; (2) the geographical restriction must not be overly broad; (3) a reasonable time limit must be imposed. *Duffner v. Alberty,* 19 Ark. App. 137, 718 S.W.2d 111 (1986). Statco does not challenge the geographic or time restrictions in the covenant. Instead it argues that: (1) SWBW had no valid interests to protect; (2) even if SWBW had valid interests to protect, the covenant was overly broad and not reasonably tailored to protect those interests; and (3) there was a failure of consideration.

██ Where a covenant not to compete grows out of an employment or other associational relationship, the courts have found an interest sufficient to warrant enforcement of the covenant only in those cases where the covenantee provided special training or made available trade secrets, confidential business information or customer lists, and then only if it is found that the associate was able to use the information he obtained to gain an unfair competitive advantage. *Duffner v. Alberty, supra.*

Statco contends that it was provided with no special training by SWBW, but the evidence was disputed on this point. Statco witnesses testified that they received only a short video training session at the beginning of their agency relationship. However, SWBW witnesses testified that agents were provided with various training opportunities, both formal and informal. Subjects of training included not only education in the products and services offered by SWBW, but in sales techniques such as closing, responding to competitors' promotions, and preventing de-activations (churn). Conflicts in testimony are to be resolved by the trial court, and we will defer to that court's superior position to judge and determine the credibility of witnesses. *DeWitt v. Johnson*, 349 Ark. 294, 77 S.W.3d 530 (2002). In any event, the furnishing of special training is just one matter to be considered under the *Duffner* analysis. We must also consider whether SWBW made trade secrets, confidential information, or customer lists available to Statco.

The trial court found that SWBW had a vital interest in protecting the confidential information contained in its customer lists, agent compensation plans, written bid proposals, and marketing strategies, to which Statco had access during its agency. We do not think the trial court's finding on this point was clearly erroneous. Customer lists have been looked upon by the courts as a most valuable asset that is especially worthy of protection, particularly in a situation, such as the one here, where an agent is servicing customers away from the principal's place of business and builds up personal relationships that bind the customer to him instead of the principal. *See Borden v. Huey*, 261 Ark. 313, 547 S.W.2d 760 (1977); *Girard v. Rebsamen Ins. Co., supra.* The customer lists provided to Statco by SWBW contained not only the names of thousands of customers, but valuable information regarding those customers, including the customer's contract expiration date. This is not the type of information that could be readily ascertained in another manner, such as by looking in the telephone directory. *See Jaraki v. Cardiology Assocs., supra* at 205. Such information would allow a competitor or a former agent to contact the customer at a time when the customer was vulnerable to changing his service provider.

Statco makes much of the fact that it, not SWBW, developed the customer list and developed relationships with the customers through its own efforts. However, it must be remembered that Statco was acting as SWBW's agent, not on its own behalf. The agency contract recognizes that, when a subscriber is enrolled for services, the subscriber becomes a customer of SWBW.

We likewise agree with the trial court that SWBW had a protectible interest in the information contained in its agent compensation plans and bid proposals, although we recognize that its interest in those items is not as strong or as apparent as its interest in the customer list. The agent compensation plans detailed the particular manner of an agent's compensation for various services and features sold. According to SWBW witness testimony, companies in the cellular industry do not usually know how their competitors' agents are compensated. The witnesses also testified that a competitor who viewed SWBW's agent compensation plans could gain considerable insight into SWBW's pricing strategies and that the competitor could discern what products and services were being emphasized, based on incentives given for the sale of those items.

Bid proposals were the written proposals formulated when Statco would compete with other CRS providers for corporate customers. In doing so, it would submit the proposals to SWBW for special rates, discounts, or features for the customer. SWBW would then reply, on that proposal sheet, regarding whether or not such a bid would be accepted. According to a SWBW witness, the information on some of these proposals would be considered confidential because competitors could learn how low SWBW could go on its rates and possibly discern SWBW's average revenue per unit (ARPU) figure. Further, the bid proposals could give a competitor insight into the manner that the company deals with corporate customers.

Based on the above, we agree with the trial court that SWBW had a protectible interest in the items discussed, in partic-

ular the customer lists.[1] However, Statco argues that the confidential value to SWBW of the abovementioned items is belied by SWBW's actions in dealing with its other agents. In particular, Statco points out that (1) SWBW allowed three of its former agents to sell a competitor's product within one year of terminating their relationship with SWBW; (2) certain confidential information in the hands of those agents was not retrieved by SWBW upon termination of the relationship; and (3) SWBW had no formal written procedures for retrieving such information from terminated agents or for monitoring an agent's compliance with the covenant not to compete.

It is undisputed that three former SWBW agents terminated their relationship with SWBW and, when they began selling for one of SWBW's competitors, they were not enjoined by SWBW from doing so. Two of the agents were operating under contracts with AT&T that were entered into before AT&T was acquired by SWBW. The AT&T contract had a covenant not to compete. The third agent was operating under a "McCaw" contract (a company acquired by AT&T prior to 1997), and that contract had no covenant not to compete.

 Statco cites no authority for its proposition that SWBW's failure to be diligent in enforcing the covenant against two former agents or in failing to monitor the retrieval of information from terminated agents precludes SWBW from asserting a protectible interest in the above items; nor have we found any such authority in our own research, although the extent of measures taken by a company to guard its information is a factor in determining whether a matter is a trade secret. *See Conagra, Inc. v.*

---

[1] As for SWBW's marketing strategies, these were contained in marketing bulletins sent by SWBW to its agents. The bulletins communicated SWBW's upcoming promotions as well as strategies for dealing with competitors' promotions. SWBW acknowledged that much of the information contained in the bulletins could be discovered by competitors through "shopping," *i.e.*, calling and pretending to be a customer and that much of the information would lose its confidential status over the passage of time, for example in the case of bulletins that announced upcoming promotions. We agree with Statco that SWBW had no protectible interest in the marketing bulletins but, given our holding that a protectible interest existed in the customer lists, compensation plans, and bid proposals, the operative provisions of the trial court's judgment are not affected.

*Tyson Foods, Inc.*, 342 Ark. 672, 30 S.W.3d 725 (2000).[2] In any event, the trial court found that SWBW presented credible evidence that it took steps to protect the secrecy of the information contained in the customer lists and other items, and we do not think that finding is clearly erroneous. Agents were required to sign confidentiality agreements and abide by a code of conduct; SWBW was very careful about who it provided customer lists to; and it had a policy to retrieve confidential information from terminated agents. Further, the fact that certain agents were able to sell for a competitor did not present the same kind of risk to SWBW as the defection of a major agent like Statco. SWBW's minor lapses in enforcement in this case do not necessarily preclude it from asserting a protectible interest in the items at issue herein.

Finally, Statco argues that SWBW could not show that Statco was able to use the confidential information to gain an unfair competitive advantage. They cite the testimony of former agents and of SWBW's own witnesses that it would be possible for an agent to sell for a competitor without disclosing confidential SWBW information. However, the fact that such a thing would be possible does not necessarily prevent enforcement of the covenant. The question is whether Statco would be *able to use* the information obtained to gain an unfair competitive advantage. *See Bendinger v. Marshalltown Trowell Co.*, *supra* at 417, n. 3. The very nature of the information at issue here, especially the customer lists, is such that a former agent would be able to use it to draw customers away from SWBW or assist a competitor in a manner that would be impossible had the agent not had access to the confidential information.

In light of the foregoing, we conclude that SWBW had a protectible interest sufficient to warrant enforcement of the

---

[2] *But see Rector-Phillips-Morse v. Vroman*, 253 Ark. 750, 489 S.W.2d 1 (1973), where the court discounted the confidential nature of certain information when twenty-three of thirty-one former RPM salesmen would have been permitted to compete with RPM and use the information. However, that scenario is far beyond the scope of what occurred here.

covenant and that the requirements set forth in *Duffner v. Alberty* have been satisfied.

We turn now to Statco's argument that the covenant was overly broad. The covenant reads in pertinent part as follows:

> AGENT [Statco] agrees that AGENT, its officers, directors, key employees, principals, sub-AGENTS, any Affiliate or the person or persons owning a controlling interest in AGENT or an Affiliate, shall during the term of this Agreement and except as noted below, for a period of one (1) year following the later of the expiration or termination of this Agreement[:]
>
> (1) not directly or indirectly induce, influence or suggest to any Subscriber of SWBW's CRS to purchase any other CMRS from another Reseller or provider of CMRS in the Area;
>
> (2) not directly or indirectly influence or suggest to any Subscriber of any other Authorized Service to purchase a competing service from any other provider or Reseller of such competing service in the Area, whether or not the competing service is technologically the same as the Authorized Service in question;
>
> (3) not, under any circumstances or conditions whatsoever, directly or indirectly, as an individual, partner, stockholder, director, officer, employee, manager, AGENT or dealer or in any other relation or capacity whatsoever engage in the sale or promotion of CMRS or any other Authorized Service on behalf of any competing Reseller or provider of such service in the Area[;]
>
> (4) not, directly or indirectly, allow any other person, firm, or other entity to use the name, trade name, goodwill, or any other assets or property of AGENT or SWBW in any manner in connection with such other entity's sale of CMRS˚ or any other Authorized Service on behalf of a competing Reseller or provider of service in the Area, and AGENT specifically agrees not to transfer, assign, authorize or consent to the transfer of an AGENT telephone number to such a competing person, firm or other entity upon the expiration or termination of this Agreement.

> Notwithstanding any language to the contrary, the restric-
> tive covenants contained herein shall not operate so as to restrict
> AGENT from the business of providing or selling Paging Serv-
> ices.

The trial court determined that the covenant's geographic
and time restrictions were narrowly drawn and therefore reasona-
ble. The court further found:

> [SWBW] has invested its resources to enable its agency repre-
> sentatives to foster a relationship so that the customer will rely on
> its representative in making purchase decisions. Statco was inti-
> mately involved in the process of establishing personal relation-
> ships and soliciting customers. It is only fair that Statco be
> restrained from taking advantage of its relationship with SWBW's
> customers, which were built with SWBW's support, until
> SWBW has had the opportunity to foster the same relationships
> with Statco's successors.

We do not find the trial court's conclusion to be clearly erroneous
because, although the covenant is broadly drawn, it is not unrea-
sonably so.[3]

We begin our discussion of this issue by noting that the cove-
nant was part of an arms-length contract entered into between
business entities. The covenant was a conspicuous part of the con-
tract, and the parties agreed, by the terms of the contract, that:

> [T]hey have read this Agreement and understand and accept the
> terms, conditions and covenants contained herein as being rea-
> sonably necessary to maintain SWBW, high standards for CRS
> and other services, thereby to protect and preserve the goodwill
> of SWBW's CRS, Services and its Marks.

---

[3] Statco points out that the trial court did not specifically rule on whether certain
particular provisions of the covenant rendered it unreasonably broad. Were we to fully
agree with that characterization of the court's findings, we would decline to address the
issue. It is the appellant's burden to obtain a ruling from the trial court and, in the absence
of such a ruling, we do not reach the issue involved. *See Kangas v. Neely*, 346 Ark. 334, 57
S.W.3d 694 (2001). However, our reading of the overall findings and conclusions by the
trial judge convinces us that she considered the covenant reasonable in all respects. Thus,
we will reach the merits of this point.

The restraints imposed by a covenant not to compete must not be broader than necessary to protect the covenantee's interests. *See Girard v. Rebsamen Ins. Co., supra.* Also, the law will not enforce a contract that merely prohibits ordinary competition. *Federated Mut. Ins. Co. v. Bennett, supra.* If a covenant prohibits the covenantor from engaging in activities which are unnecessary to protect the promise, the covenant is unreasonable. *See Easley v. Sky, Inc.,* 15 Ark. App. 64, 689 S.W.2d 356 (1985). The extent of restraint in a covenant is critical in determining its reasonableness. *Restatement (Second) of Contracts* § 188, comment d (1981). The test to be employed is whether the restraint is reasonable as between the parties and not injurious to the public by reason of its effect upon trade. Whether or not the restraint is reasonable is to be determined by considering whether it is such as to only afford a fair protection to the interest of the party in whose favor it is given and not so large as to interfere with the interests of the public. *Girard v. Rebsamen Ins. Co., supra* at 159.

Statco argues that the covenant is too broad because it applies not only to Statco's owners, officers, and directors, but also to "key employees," a term that is not defined in the contract. It further contends that the covenant does not merely prevent solicitation of SWBW customers but prohibits Statco from directing any *potential* customer to another service provider. Additionally, Statco claims, the covenant precludes Statco personnel, even as stockholders, from engaging in the sale or promotion of a competitor's service. Moreover, Statco contends that the fourth clause of the covenant would prohibit it from transferring its telephone number or subleasing its premises to a competitor.

We interpret the covenant as being aimed at protecting three SWBW interests: (1) keeping its customers from being appropriated by a former agent; (2) keeping the confidential information possessed by its agent from falling into the hands of a competitor; and (3) protecting its name, goodwill, and assets. Our supreme court has recognized that covenants not to compete are a legitimate means of protecting a principal's desire that a former employee not appropriate its customers. *See Borden v. Huey, supra; Girard v. Rebsamen Insurance Co., supra.* We conclude that the par-

ticular restraints objected to by Statco in this case reasonably serve that objective and the objective of preventing a competitor from acquiring confidential information.

Although the term "key employee" has no established definition, it is more restrictive than the term "employee" and indicates a reasonable desire to restrain only important Statco personnel who possess key information from competing with SWBW. As for the fact that the covenant restricts Statco from directing potential customers to a competitor or from promoting a competitor's product as a stockholder, these restrictions legitimately restrain Statco from serving the interests of SWBW's competitors, which could lead to the sharing of confidential information with those competitors. Likewise, SWBW would have an understandable desire that its agent's telephone number and place of business not become a means by which its customers could inadvertently fall into the lap of a competitor.

When these premises are considered, we disagree with Statco that the terms of the covenant are overly broad. We also note that, even though the one-year time restraint is not challenged on appeal, the fact that the covenant's restraints apply only for a one-year period buttresses our view that the covenant is not unreasonable in its scope.

Statco further argues that there were other less restrictive means that SWBW could have employed to protect its interests. It points out that the agency contract contained restrictions on Statco's activities, such as a restriction against divulging customer lists and a mandate to return SWBW marketing materials upon termination of the contract. Further, Statco argues that SWBW could simply have included a non-diversion clause in the contract, prohibiting Statco from diverting SWBW customers following termination.

Statco's argument would apply to invalidate virtually every covenant not to compete and, as we have already pointed out, such covenants may be enforceable. A reasonably drawn covenant not to compete is an effective means by which a principal may protect its customers and its confidential information from appropriation and use by former agents or competitors. While the

alternative methods suggested by Statco could be of some use, they do not substitute for a temporary ban on competitive activity, which assures the principal that its interests will not be compromised. We therefore affirm the trial court's finding that the covenant in this case was reasonably drawn.

 Next, Statco argues that, because the right to use SWBW marks was a consideration for it signing the covenant not to compete, that consideration failed when SWBW began to market its product under the name "Cingular." We disagree. First, the trial judge made no ruling regarding consideration. Even if a matter is pled, we will not address it if it was not brought to the trial judge's attention for a ruling. *Britton v. Floyd*, 293 Ark. 397, 738 S.W.2d 408 (1987). Second, as the covenant recites, there was consideration for the covenant other than the use of the SWBW marks. Third, SWBW did not begin using the Cingular name in public until after Statco had sent the letter notifying SWBW that it would begin selling competitive products.

 The final issue concerns the trial court's finding that Statco misappropriated SWBW's trade secrets. A trade secret is information, including a formula, pattern, compilation, program, device, method, technique, or process that derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by, other persons who can obtain economic value from its disclosure or use and is the subject of efforts that are reasonable under the circumstances to maintain its secrecy. Ark. Code Ann. § 4-75-601(4) (Repl. 2001). Arkansas courts rely on six factors to determine whether something is a trade secret: (1) the extent to which the information is known outside the business; (2) the extent to which the information is known by employees and others involved in the business; (3) the extent of measures taken by plaintiff to guard the secrecy of the information; (4) the value of the information to plaintiff and its competitors; (5) the amount of effort or money expended by plaintiff in developing the information; and (6) the ease or difficulty with which the information could properly be acquired by others. *See City Slickers, Inc. v. Douglas*, 73 Ark. App. 64, 40 S.W.3d 805 (2001). To be entitled to injunctive relief,

actual or threatened misappropriation must be shown. Ark. Code Ann. § 4-75-604 (Repl. 2001). Misappropriation means:

> (A) Acquisition of a trade secret of another person who knows or has reason to know that the trade secret was acquired by improper means; or
>
> (B) Disclosure or use of a trade secret of another without express or implied consent by a person who:
>
>> (i) Used improper means to acquire knowledge of the trade secret; or
>>
>> (ii) At the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was:
>>
>>> (a) Derived from or through a person who had utilized improper means to acquire it;
>>>
>>> (b) Acquired it under circumstances giving rise to a duty to maintain secrecy or limit its use; or
>>>
>>> (c) Derived from or through a person who owed a duty to the person seeking relief to maintain secrecy or limit its use; or
>>
>> (iii) Before a material change of his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

Ark. Code Ann. § 4-75-601(2) (Repl. 2001).

■■■ Even if the information acquired by Statco during the course of its agency qualifies as a trade secret, the record is bereft of any evidence that Statco has, or has threatened to, improperly misappropriate a trade secret. Nevertheless, an injunction may issue if there is evidence that an inevitable misappropriation will occur. *See Cardinal Freight Carriers, Inc. v. J.B. Hunt Transp. Servs., Inc.*, 336 Ark. 143, 987 S.W.2d 642 (1999). We do not believe there is enough evidence in this case to support a finding of inevitable misappropriation. Statco has given no indication that it will disclose trade secrets, nor is there any evidence that it must necessarily do so to conduct its business. As mentioned earlier, there was testimony that a former agent could work for a competitor

without using confidential information regarding his former principal.

Based on the foregoing, we affirm the trial judge's finding that Statco violated the covenant not to compete, and we reverse her finding that Statco violated the trade secrets act. We also modify the third part of the trial court's judgment to add the following phrase at the end of the clause: "for a period of one year from March 1, 2001."

Affirmed in part as modified; reversed in part.

STROUD, C.J., and PITTMAN, HART, and BIRD, JJ., agree.

GRIFFEN, J., dissents in part.

WENDELL L. GRIFFEN, Judge, dissenting. The majority decision stands in direct conflict with our own case law. In the name of holding parties to their agreements and based on disregard for both the purpose of the law of unfair competition and economic reality, today's decision violates the longstanding and justified principle that only where goodwill has been transferred ancillary to the sale and purchase of a business, for valid consideration, does a purchaser have a legitimate pecuniary interest in protecting that goodwill from competition from a seller. However, even when goodwill has been transferred, our case law requires that contracts in partial restraint of trade, such as clearly involved in this instance, are valid only to the extent reasonably necessary for the purchaser's protection. *See Duffner v. Alberty*, 19 Ark. App. 137, 718 S.W.2d 111 (1986).

Plainly, this case involves neither the sale and purchase of a business nor the transfer of goodwill attendant to such a transaction. It is nothing more than a dispute between an employer-principal Southwestern Bell Wireless (SWBW) and its former agent STATCO Wireless (STATCO) about whether the public will be allowed to choose competing cellular telephone services in the Hot Springs and Little Rock areas through the former agent. Beyond that, the record demonstrates that the non-competition covenant before us was not necessary to protect the legitimate interest of SWBW concerning its customer lists, contracts, and agent compensation plans. Although I agree that the trial court

erred in finding that STATCO misappropriated trade secrets and agree that SWBW had no proprietary interest in the marketing strategies bulletins, I perceive no material difference between the facts of this case and those presented by our decision in *Duffner v. Alberty*, *supra*, where we reached an entirely different result. Therefore, I dissent from the decision to affirm any part of the trial court's decision and judgment.

*Duffner* involved a covenant not to compete in an employment agreement between an orthopedic surgeon and the practice group with whom he practiced after completing his residency in June 1984. Duffner moved to Fort Smith, joined the well established orthopedic group headed by Dr. Joe Paul Alberty and Dr. John Wideman, and signed a written agreement containing a covenant that stated, should he desire to leave the group, he would not practice within a radius of thirty miles of the group offices for one year from the date of termination. Duffner practiced with the group until late spring of 1985, when he joined another orthopedic clinic located in the same building where his former associates maintained their practice. As in this case, the chancellor in *Duffner* entered an order enjoining Duffner for a period of one year from the date of the order. We reversed that decision in the face of the chancellor's finding that the appellees had a valid and enforceable right to protect their substantial investment in their medical practice, and to protect their established medical clientele. In doing so, Chief Judge Cracraft, writing the opinion following this unanimous *en banc* decision, stated:

> Although contracts between individuals ought not to be entered into lightly, all other considerations must give way where matters of public policy are involved. From our review of all the facts and circumstances, we are of the opinion that the contract provision prohibiting appellant from practicing medicine within thirty miles of the City of Fort Smith constitutes an undue interference with the interests of the public right of availability of the orthopedic surgeon it prefers to use and that the covenant's enforcement would result in an unreasonable restraint of trade.
>
> Here the contract did not relate to the sale of a business and its goodwill. The appellees' goodwill remained with them. The benefits which the appellant obtained from the reputation and

goodwill of his former associates would be no greater than that of an employee in any other established business. *It is only in those instances where goodwill has, for valid consideration, been transferred that the purchaser has a legitimate pecuniary interest in protecting against its being drained by competition from the seller.* Nor were any trade secrets, formulas, methods, or devices which gave appellant an advantage over the appellees involved here. At the time he joined the association he had received his training and skills elsewhere and brought them with him. There is nothing in the record to indicate that he learned any trade secret or surgical procedures from the appellees which were not readily available to other orthopedic surgeons. To the contrary, the record reflects that while in the association he performed some orthopedic surgical procedures which the appellees did not perform.

Although the chancellor found that the appellant had access to appellees' confidential patient files, there was no evidence that he attempted to memorize them or use information from those files to entice any of their former patients to become patients of his new association. Although there was evidence that he obtained the files on twenty-eight persons from the appellees, it was explained that these were not new patients but those who were receiving follow-up medical attention after having undergone surgery by the appellant during his association with the appellees. Other than those twenty-eight persons receiving post-operative care, he testified that he had not seen more than two of appellees' former patients.

We cannot conclude from the evidence that appellant maintained a personal relationship or acquaintance with appellees' patients or that their "stock of patients" was appropriated by the appellant when he left their offices. . . . We conclude that the enforcement of this covenant would do no more than prohibit ordinary competition.

*Id.* at 141–42, 718 S.W.2d at 113–14. (Emphasis added.)

Contracts in partial restraint of trade, where *ancillary to a sale of a business or profession* with its goodwill, are valid to the extent reasonably necessary to the purchaser's protection, and are looked upon with greater favor than such an agreement ancillary to an employer-employee or professional association relationship. *Madison Bank & Trust v. First Nat'l Bank*, 276 Ark. 405, 635 S.W.2d 268 (1982); *Marshall v. Irby*, 203 Ark. 795, 158 S.W.2d 693

(1942); *Easley v. Sky, Inc.*, 15 Ark. App. 64, 689 S.W.2d 356 (1985). Where the covenant grows out of an employment or other associational relationship, our appellate courts have found an interest sufficient to warrant enforcement of the covenant only in those cases where the covenantee provided special training, or made available trade secrets, confidential business information or customer lists, and then *only if it is found that the associate was able to use information so obtained to gain an unfair competitive advantage.* See *Orkin Exterminating Co. v. Weaver*, 257 Ark. 926, 521 S.W.2d 69 (1975); *Rector-Phillips-Morse, Inc. v. Vroman*, 253 Ark. 750, 489 S.W.2d 1 (1973); *All-State Supply, Inc. v. Fisher*, 252 Ark. 962, 483 S.W.2d 210 (1972); *Girard v. Rebsamen Ins. Co.*, 14 Ark. App. 154, 685 S.W.2d 526 (1985). The validity of these covenants depends upon the facts and circumstances of each particular case. *Evans Laboratories, Inc. v. Melder*, 262 Ark. 868, 562 S.W.2d 62 (1978). The general rule is that a contract in restraint of trade ancillary to a sale or a business transaction, which is reasonably limited as to time and place, is not against public policy and is not invalid. *Madison Bank & Trust v. First Nat'l Bank, supra; see also Bloom v. Home Ins. Agency*, 91 Ark. 367, 121 S.W. 293 (1909); *Webster v. Williams*, 62 Ark. 101, 34 S.W. 537 (1896); *United States v. Empire Gas Corp.*, 537 F.2d 296 (8th Cir. 1976), *cert. den.* 429 U.S. 1122 (1976); 17A C.J.S. Contracts § 249 (1999); 54A Am. Jur. 2d *Monopolies, Etc.*, 853 (1996).

The courts view a restraint of trade agreement ancillary to the transfer of a business with greater liberality, being "more prone to uphold restrictive clauses" than employer/employee covenants. *Madison Bank & Trust v. First Nat'l Bank*, 276 Ark. at 409, 635 S.W.2d at 270; *see also McLeod v. Meyer*, 237 Ark. 173, 372 S.W.2d 220 (1963); 42 Am. Jur. 2d *Injunctions* § 141 (2000); and 54A Am.Jur.2d *Monopolies, Etc.* § 853 (1996). In *Little Rock Towel & Linen Supply Co. v. Independent Linen Service Co.*, our supreme court said, "Owing to the possibility that a person may be deprived of his livelihood the courts are less disposed to uphold restraints in contracts of employment than to uphold them in con-tracts of sale." 237 Ark. 877, 879, 477 S.W.2d 34, 36 (1964). Whether a restraint provision is reasonable or unreasonable is a question to be determined under the facts of each case. *McLeod v.*

*Meyer, supra.* The trial court's findings will not be reversed unless clearly erroneous. *Ford Motor Credit Co. v. Yarbrough,* 266 Ark. 457, 587 S.W.2d 68 (1979); Ark. R. Civ. P. Rule 52(a).

The non-competition covenants before us plainly do not arise from the sale of an established business or profession. There is no proof that SWBW sold its cellular phone service business to STATCO. No evidence supports a conclusion that SWBW would be deprived of its livelihood unless the non-competition covenant in these agreements is upheld. Thus, the more liberal standard applicable to agreements which restrain trade ancillary to the transfer of a business has no application to this case.

While it is true that the party challenging the validity of a non-competition covenant arising from an employment or associational relationship has the burden of proving that the arrangement violates public policy, that burden of proof does not weaken the threshold principle that such arrangements are not favored under the law and that even if created to protect legitimate business interests, it must be shown that the person restrained by the covenant was able to use information obtained by the employment or associational relationship to gain an *unfair* competitive advantage. *Orkin Exterminating Co. v. Weaver, supra.* The law does not prohibit a former associate or employee from altogether competing against an employer or principal, but merely prohibits the use of confidential information gained from the former employer or principal to attain an unfair competitive advantage.

By relying on the non-competition covenant, SWBW seeks to blur, if not altogether erase, the rather fundamental distinction in our restraint of trade jurisprudence between non-competition covenants attendant to the sale of a business and such covenants contained in employment or associational agreements such as the one it had with STATCO. Yet, that distinction is both plain and sound. Someone purchasing a going concern and its goodwill should not be vulnerable to the obvious competitive disadvantage of competing with the seller for the goodwill and patronage of the seller's former customers. On the other hand, someone who merely contracts to work for another person should not be restrained from offering his services to other contractors after leav-

ing a former associational or employment relationship unless there is no other less restrictive remedy available to protect the former employer from *unfair* competition. In this case, SWBW not only failed to immediately seek return of the information it deemed proprietary—even to the date it filed suit to enforce the non-competition covenant—but produced no proof that STATCO's continued presence as a seller of competing cellular phone service posed the risk of *unfair* competition.

A glaring example, but by no means the only one, that proves that the anti-competitive effect of the non-competition covenant went far beyond anything needed to protect the customer list, agent compensation plan, and contract bid documents from exploitation is found in sub-paragraph 4 of Paragraph 18, the paragraph containing the non-competition covenant. At sub-paragraph 4, the agreement provides that STATCO will

> not, directly or indirectly, allow any other person, firm, or other entity to use the name, trade name, goodwill, or any other assets or property of AGENT . . . any manner in connection with such other entity's sale of [cellular phone service] or any other Authorized Service on behalf of a competing Reseller or provider of service in the Area, and AGENT specifically agrees not to transfer, assign, authorize or consent to the transfer or an AGENT telephone number to such a competing person, firm or other entity upon the expiration or termination of this Agreement.

There was no proof that SWBW had any proprietary interest in STATCO's phone number, office lease, or trade name. There was no proof that SWBW had any interest in whether anyone besides STATCO engaged in the "sale of [cellular phone service] . . . on behalf of a competing Reseller or provider of service in the Area," aside from hindering customers from the chance to obtain cellular phone service from SWBW competitors. The notion that SWBW needed to prevent STATCO from leasing its office space to one of its six competitors (Alltel, Sprint, Cricket, Nextel, CenturyTel, and SunCom) in order to protect the proprietary nature of the customer lists, agent compensation plans, and contract bid proposals is patently absurd. By affirming the trial court's decision enforcing the non-competition covenant in the face of this

absurdity, the majority defies the longstanding principle that even when non-competition covenants arise out of the sale of a business with its goodwill, they are enforced only if necessary to protect the purchaser from unfair competition.

It is certainly true that STATCO agreed to the non-competition covenant that SWBW placed in the exclusive agency agreements. However, that fact has never been controlling or directed our understanding of the legal principles applied to cases involving the enforceability of non-competition covenants. No matter what parties write into their agreements, the public has the right to free and open markets for goods and services. This right, not the wording of non-competition covenants, is the fundamental principle before which all contracts must yield if the notion of free enterprise is to be anything but a fiction. In this case, that means the public has the right to select cellular phone service from whomever can make that service available. The non-competition covenant upheld today restrains the public's exercise of that right by restricting access to competing cellular phone service in the same geographic market with SWBW.

The proprietary information contained in the SWBW customer lists, agent compensation plans, and bid proposals falls far short of the kind of sensitive and personal information exchanged between patients and their physicians. Even so, we reversed the injunction in *Duffner*. Here, as in *Duffner*, the non-competition covenant did not arise out of the sale of a business and transfer of goodwill. As in that case, the record before us does not show that STATCO made any attempt to retain or exploit any of the proprietary information to "entice" any SWBW customers to convert their cellular phone service to a SWBW competitor.

I am unimpressed by the argument that our decision in *Duffner* resulted because we found something peculiar about the practice of orthopedic medicine such that our holding in that case should not apply to a case involving the availability of cellular telephone service. *Duffner*, we are told according to that argument , is not controlling on this case because there is a legally material distinction, insofar as the law of unfair competition and restraint of trade is concerned, between practicing orthopedic medicine (a

professional calling) and marketing cellular telephone service. We should not read *Duffner* or the rest of our case law in this area in such simplistic terms.

In fact, a survey of our decisions dealing with challenges to non-competition covenants quickly disproves the notion that the law makes such a distinction between professional undertakings and other commercial or business pursuits. In *Rector-Phillips-Morse v. Vroman, supra,* our supreme court affirmed a trial court's decision to deny an injunction to enforce a three-year non-competition covenant between a real estate agency and one of its former salesmen because the three-year restriction was not reasonably necessary to protect the realtor from unfair competition. In *Orkin Exterminator Co. v. Weaver,* 257 Ark. 926, 521 S.W.2d 69 (1975), the supreme court similarly affirmed a trial court's denial of an injunction to enforce a two-year non-competition covenant between a pest control company and a former employee who re-entered the pest control business in partnership with another former employee within a week after being discharged. Justice George Rose Smith's analysis of the proof in that case is both instructive as well as dispositive of the view that the law should somehow protect certain employers from what amounts to ordinary, as contrasted to unfair, competition. Justice Smith wrote:

> The basic flaw in Orkin's position is that its contract, according to its own proof, is directed not against unfair competition but against competition of any kind on the part of its former employees. . . . If Orkin's position is sound, then any employer in any business devoted to selling - whether the sales be of insurance, real estate, clothing, groceries, hardware, or anything else - can validly prohibit its former salesmen from engaging in that business within the vicinity for as long as two years after the termination of employment. Needless to say, the law does not provide any such protection from ordinary competition.

*Id.* at 929-930, 521 S.W.2d at 71. (Citations omitted.)

Our decision in *Duffner,* like the decisions by our supreme court and other case law dealing with unfair competition and covenants not to compete, does not turn on the peculiarities of a given business, profession, trade, or craft. Our law dealing with non-competition covenants is based on whether such a covenant

in whatever enterprise amounts to an unfair restraint on ordinary competition. In *Duffner*, Chief Judge Cracraft concluded the opinion by observing "that the enforcement of this covenant would do no more than prohibit ordinary competition." 19 Ark. App. at 142, 718 S.W.2d at 114. That inquiry is valid no matter what the enterprise may be that is subject to the non-competition covenant.

I am equally unpersuaded by the majority view that STATCO's position would invalidate every covenant not to compete. The law does not guarantee anyone a right to be free from ordinary competition. Nor does the law justify "a temporary ban on competitive activity, which assures the principal that its interests will not be compromised" where goodwill has not been transferred ancillary to the purchase and sale of a business. That principle was clearly controlling in our *Duffner* decision. The majority does not explain why it does not govern this case, let alone justify departing from it.

For the reasons stated by Chief Judge Cracraft, the holding in *Duffner* should apply to the facts and dictate the outcome of this case. There is nothing wrong with ordinary competition and nothing unfair about having to engage in ordinary competition against former business associates for the patronage of valued customers. No matter what parties write into their employment agreements, public policy holds that there is something fundamentally wrong about denying people freedom to choose where they want to do business by preventing them access to outlets where competitors can operate. That is why non-competition covenants are disfavored by our law.

I dissent.